## *PRELIMINARY PRINT*

## VOLUME 603 U. S. PART 1

### PAGES 480–519

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 28, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# FISCHER *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT

No. 23–5572.   Argued April 16, 2024—Decided June 28, 2024

The Sarbanes-Oxley Act of 2002 imposes criminal liability on anyone who
corruptly "alters, destroys, mutilates, or conceals a record, document,
or other object, or attempts to do so, with the intent to impair the ob-
ject's integrity or availability for use in an official proceeding."   18
U. S. C. § 1512(c)(1).   The next subsection extends that prohibition to
anyone who "otherwise obstructs, influences, or impedes any official pro-
ceeding, or attempts to do so."   § 1512(c)(2).   Petitioner Joseph Fischer
was charged with violating § 1512(c)(2) for his conduct on January 6,
2021.   On that day, Congress convened in a joint session to certify the
votes in the 2020 Presidential election.   While they did so, a crowd of
supporters of then-President Donald Trump gathered outside the Capi-
tol, and some eventually forced their way into the building, breaking
windows and assaulting police.   App. 189.   This breach of the Capitol
delayed the certification of the vote.   The criminal complaint alleges
that Fischer was among those who invaded the building.   Fischer was
charged with various crimes for his actions on January 6, including ob-
structing an official proceeding in violation of § 1512(c)(2).   He moved
to dismiss that charge, arguing that the provision criminalizes only at-
tempts to impair the availability or integrity of evidence.   The District
Court granted his motion in relevant part.   A divided panel of the D. C.
Circuit reversed and remanded for further proceedings.

*Held*: To prove a violation of § 1512(c)(2), the Government must establish
that the defendant impaired the availability or integrity for use in an
official proceeding of records, documents, objects, or other things used
in an official proceeding, or attempted to do so.   Pp. 485–498.

  (a) To determine the scope of the residual "otherwise" clause in
§ 1512(c)(2), the Court must decide how it is linked to its "surrounding
words," *Yates* v. *United States*, 574 U. S. 528, 536 (plurality opinion), and
"'give effect, if possible, to every clause and word of [the] statute.'"
*Williams* v. *Taylor*, 529 U. S. 362, 404 (quoting *United States* v. *Men-
asche*, 348 U. S. 528, 538–539).   The Court considers both "the specific
context" in which (c)(2) appears "and the broader context of the statute
as a whole."   *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341.   Pp. 486–492.

    (1) Section 1512(c)(1) describes particular types of criminal conduct
in specific terms.   The purpose of (c)(2) is, as the parties agree, to cover

Page Proof Pending Publication

some set of "matters not specifically contemplated" by (c)(1).  *Republic of Iraq* v. *Beaty*, 556 U. S. 848, 860.  Perhaps Congress sought to criminalize *all* obstructive acts in § 1512(c), and having named a few examples in (c)(1), devised (c)(2) to prohibit the rest.  But (c)(2) could have a narrower scope if Congress designed it to fill inadvertent gaps in the focused language of (c)(1).

One way to discern the reach of an "otherwise" clause is to look for guidance from whatever examples come before it.  Two general principles are relevant.  First, the canon of *noscitur a sociis* teaches that a word is "given more precise content by the neighboring words with which it is associated."  *United States* v. *Williams*, 553 U. S. 285, 294.  And under the related canon of *ejusdem generis*, a general or collective term at the end of a list of specific items is typically controlled and defined by reference to those specific items that precede it.  *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450, 458.  These approaches to statutory interpretation track the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it.

Under these principles, the "otherwise" provision of § 1512(c)(2) is limited by the list of specific criminal violations that precede it in (c)(1).  If, as the Government asserts, (c)(2) covers all forms of obstructive conduct *beyond* § 1512(c)(1)'s focus on evidence impairment, Congress would have had little reason to provide any specific examples at all.  And the sweep of subsection (c)(2) would swallow (c)(1), leaving that narrower provision with no work to do.

Tethering subsection (c)(2) to the context of (c)(1) recognizes the distinct purpose of each provision.  Subsection (c)(1) refers to a defined set of offense conduct—four types of actions that, by their nature, impair the integrity or availability of records, documents, or objects for use in an official proceeding.  Reading the "otherwise" clause as having been given more precise content by (c)(1), subsection (c)(2) makes it a crime to impair the availability or integrity of records, documents, or objects used in an official proceeding in ways other than those specified in (c)(1).  For example, it is possible to violate (c)(2) by creating false evidence—rather than altering incriminating evidence.  Subsection (c)(2) also ensures that liability is still imposed for impairing the availability or integrity of *other* things used in an official proceeding beyond the "record[s], document[s], or other object[s]" enumerated in (c)(1), such as witness testimony or intangible information.  Pp. 486–491.

(2) It makes sense to read (c)(2) as limited by (c)(1) in light of the history of the provision.  The Enron accounting scandal exposed a loophole in § 1512.  At that time, the statute imposed liability on anyone who, among other things, corruptly persuaded another person to shred

Page Uncorrected Pending Publication

documents. But it curiously failed to impose liability on a person who destroyed records himself. The parties agree that Congress enacted § 1512(c) as part of the broader Sarbanes-Oxley Act to plug this loophole. It would be peculiar to conclude that in closing the Enron gap, Congress created a catchall provision that reaches beyond the scenarios that prompted the legislation. Pp. 491–492.

(b) The broader context of § 1512 in the criminal code confirms that (c)(2) is limited by the scope of (c)(1). Federal obstruction law consists of numerous provisions that target specific criminal acts and settings, much of which would be unnecessary if (c)(2) criminalized essentially all obstructive conduct. Given the Court's obligation to give meaning where possible to each word and provision in the Code, *Taylor*, 529 U. S., at 404, the Court's narrower interpretation of subsection (c)(2) is the superior one.

An unbounded interpretation of subsection (c)(2) would also render superfluous the careful delineation of different types of obstructive conduct in § 1512 itself. That section provides a reticulated list of nearly two dozen means of committing obstruction with penalties ranging from three years to life in prison, or even death. The Government's reading would lump together under (c)(2) disparate types of conduct for which Congress had assigned proportionate sentences. Pp. 492–496.

(c) The Government's theory would also criminalize a broad swath of prosaic conduct, exposing activists and lobbyist to decades in prison. Our usual approach in obstruction cases has been to "resist reading" particular sub-provisions "to create a coverall" statute. *Yates*, 574 U. S., at 549 (plurality opinion). Nothing in the text or statutory history gives the Court a reason to depart from that practice today. And the Government's interpretation would give prosecutors broad discretion to seek a 20-year maximum sentence for acts Congress saw fit to punish with far shorter sentences. By reading (c)(2) in light of (c)(1), the Court affords proper respect to "the prerogatives of Congress" in carrying out the quintessentially legislative act of defining crimes and setting the penalties for them. *United States* v. *Aguilar*, 515 U. S. 593, 600. Pp. 496–498.

64 F. 4th 329, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion, *post*, p. 498. BARRETT, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined, *post*, p. 506.

*Jeffrey T. Green* argued the cause for petitioner. With him on the briefs were *Heidi R. Freese, Ronald A. Krauss,* and *Frederick W. Ulrich.*

Opinion of the Court

*Solicitor General Prelogar* argued the cause for the United States.  With her on the brief were *Acting Assistant Attorney General Argentieri, Deputy Solicitor General Feigin, Matthew Guarnieri,* and *James I. Pearce.** 

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Sarbanes-Oxley Act of 2002 imposes criminal liability on anyone who corruptly "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."  18 U. S. C. § 1512(c)(1).  The next subsection extends that prohibition to anyone who "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so."  § 1512(c)(2). We consider whether this "otherwise" clause should be read in light of the limited reach of the specific provision that precedes it.

_____

*Briefs of *amici curiae* urging reversal were filed for America's Future et al. by *William J. Olson, Jeremiah L. Morgan, Robert J. Olson, Patrick M. McSweeney, J. Mark Brewer, Michael Boos, Daniel H. Jorjani,* and *John I. Harris III*; for Citizens Concerned for the Constitutional Rights of Defendants by *Paloma A. Capanna*; for Liberty Counsel Action, Inc., by *Mathew D. Staver, Anita L. Staver,* and *Horatio G. Mihet*; for Sen. Tom Cotton et al. by *R. Trent McCotter* and *Gene P. Hamilton*; and for Christopher Warnagiris et al. by *Theodore M. Cooperstein* and *Marina Medvin.*

Briefs of *amici curiae* urging affirmance were filed for Former Government Officials et al. by *Matthew A. Seligman, Fred Wertheimer,* and *E. Danya Perry*; and for John Danforth et al. by *Richard D. Bernstein, pro se.*

Briefs of *amici curiae* were filed for the American Center for Law and Justice by *Jay Alan Sekulow, Stuart J. Roth, Jordan A. Sekulow, Walter M. Weber,* and *Benjamin P. Sisney*; for the FormerFedsGroup Freedom Foundation et al. by *Edward Lacy Tarpley, Jr.*; for the LONANG Institute by *Kerry Lee Morgan* and *Randall A. Pentiuk*; and for Law-Linguistics Research Team Clark D. Cunningham et al. by *Clark D. Cunningham, pro se.*

## I

This case concerns the prosecution of petitioner Joseph Fischer for his conduct on January 6, 2021. That day, both Houses of Congress convened in a joint session to certify the votes in the 2020 Presidential election. While they did so, a crowd of supporters of then-President Donald Trump gathered outside the Capitol. As set forth in the criminal complaint against Fischer, some of the crowd eventually "forced entry" into the building, "breaking windows," and "assaulting members of the U.S. Capitol Police." App. 189. This breach of the Capitol caused Members of Congress to evacuate the Chambers and delayed the certification process. The complaint alleges that Fischer was one of those who invaded the building.

According to the complaint, about an hour after the Houses recessed, Fischer trespassed into the Capitol and was involved in a physical confrontation with law enforcement. Fischer claimed in Facebook posts that he "pushed police back about 25 feet," and that he "was inside the [Capitol] talking to police." *Id.*, at 193–194. Body camera footage shows Fischer near a scrum between the crowd and police who were trying to eject trespassers from the building. *Id.*, at 195–196.

A grand jury returned a seven-count superseding indictment against Fischer. Six of those counts allege that Fischer forcibly assaulted a federal officer, entered and remained in a restricted building, and engaged in disorderly and disruptive conduct in the Capitol, among other crimes. See *id.*, at 181–185; 18 U. S. C. §§ 111(a), 231(a)(3), 1752(a)(1), (a)(2); 40 U. S. C. §§ 5104(e)(2)(D), (G). Those six counts carry maximum penalties ranging from six months' to eight years' imprisonment.

In Count Three, the only count now before us, the Government charged Fischer with violating 18 U. S. C. § 1512(c)(2). Fischer moved to dismiss that count, arguing that the provi-

sion criminalizes only attempts to impair the availability or integrity of evidence. The District Court granted his motion in relevant part. It concluded that the scope of Section 1512(c)(2) is limited by subsection (c)(1) and therefore requires the defendant to "'have taken some action with respect to a document, record, or other object.'" 2022 WL 782413, *4 (DC, Mar. 15, 2022) (quoting *United States* v. *Miller*, 589 F. Supp. 3d 60, 78 (DC 2022)).

A divided panel of the D. C. Circuit reversed and remanded for further proceedings. Judge Pan, writing for the court, held that the word "otherwise" in Section 1512(c)(2) means that the provision unambiguously covers "all forms of corrupt obstruction of an official proceeding, other than the conduct that is already covered by § 1512(c)(1)." 64 F. 4th 329, 336 (2023). Judge Walker concurred in part and concurred in the judgment because he read the *mens rea* element of the statute—"corruptly"—as requiring a defendant to act with "an intent to procure an unlawful benefit." *Id.*, at 361 (internal quotation marks omitted).

Judge Katsas dissented. In his view, the language in subsection (c)(1) narrows the language that comes after the word "otherwise" in subsection (c)(2). He therefore construed Section 1512(c)(2) as applying "only to acts that," like the ones specified in (c)(1), "affect the integrity or availability of evidence" at an official proceeding. *Id.*, at 363.

We granted certiorari. 601 U. S. —— (2023).

## II

The controversy before us is about the scope of the residual "otherwise" clause in Section 1512(c)(2). On the one hand, Fischer contends that (c)(2) "applies only to acts that affect the integrity or availability of evidence." Brief for Petitioner 8. On the other, the Government argues that (c)(2) "capture[s] all forms of obstructive conduct *beyond* Section 1512(c)(1)'s focus on evidence impairment." Brief for United States 13.

Resolving such a dispute requires us to determine how the residual clause is linked to its "surrounding words." *Yates* v. *United States*, 574 U. S. 528, 536 (2015) (plurality opinion); see, *e. g.*, *United States* v. *Hansen*, 599 U. S. 762, 774–775 (2023). In doing so, "we must 'give effect, if possible, to every clause and word of [the] statute.'" *Williams* v. *Taylor*, 529 U. S. 362, 404 (2000) (quoting *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955)). To that end, we consider both "the specific context" in which (c)(2) appears "and the broader context of the statute as a whole." *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997); see, *e. g.*, *Pulsifer* v. *United States*, 601 U. S. 124, 133 (2024) (choosing between "two grammatically permissible ways" to read a sentencing statute "by reviewing text in context").

### A

### 1

Section 1512 provides:

"(c) Whoever corruptly—

"(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

"(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

"shall be fined . . . or imprisoned not more than 20 years, or both."

Subsection (c)(1) describes particular types of criminal conduct in specific terms. To ensure the statute would not be read as excluding substantially similar activity not mentioned, (c)(2) says it is also illegal to engage in some broader range of unenumerated conduct.

The purpose of the "otherwise" clause is therefore, as the parties agree, to cover some set of "matters not specifically contemplated" by (c)(1). *Republic of Iraq* v. *Beaty*, 556 U. S.

848, 860 (2009); see Brief for Petitioner 12; Brief for United States 12–13. The problem is defining what exactly Congress left for (c)(2). Perhaps Congress sought to criminalize *all* obstructive acts in Section 1512(c), and having named a few examples in (c)(1), devised (c)(2) to prohibit the rest in one go. The point of (c)(1) would then be to illustrate just one type of conduct among many (c)(2) prohibits; it would be subsidiary to the overarching prohibition in (c)(2). But (c)(2) could well have a narrower scope if Congress designed it with the focused language of (c)(1) in mind. Subsection (c)(1) would then prohibit particular types of obstructive conduct and (c)(2) would fill any inadvertent gaps that might exist.

One way to discern the reach of an "otherwise" clause is to look for guidance from whatever examples come before it. Two general principles are relevant. First, the canon of *noscitur a sociis* teaches that a word is "given more precise content by the neighboring words with which it is associated." *United States* v. *Williams*, 553 U. S. 285, 294 (2008). That "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with" "the company it keeps." *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995). And under the related canon of *ejusdem generis*, "a 'general or collective term' at the end of a list of specific items" is typically "'controlled and defined by reference' to the specific classes . . . that precede it." *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450, 458 (2022) (quoting first *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 225 (2008); then *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 115 (2001)); accord, *Bissonnette* v. *LePage Bakeries Park St., LLC*, 601 U. S. 246, 252 (2024). These approaches to statutory interpretation track the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it.

To see why, consider a straightforward example. A zoo might post a sign that reads, "do not pet, feed, yell or throw objects at the animals, or otherwise disturb them." If a vis-

itor eats lunch in front of a hungry gorilla, or talks to a friend near its enclosure, has he obeyed the regulation? Surely yes. Although the smell of human food or the sound of voices might well disturb gorillas, the specific examples of impermissible conduct all involve direct interaction with and harassment of the zoo animals. Merely eating or talking is so unlike the examples that the zoo provided that it would be implausible to assume those activities were prohibited, even if literally covered by the language.

The idea is simply that a general phrase can be given a more focused meaning by the terms linked to it. That principle ensures—regardless of how complicated a sentence might appear—that none of its specific parts are made redundant by a clause literally broad enough to include them. See *Yates*, 574 U. S., at 545–546 (plurality opinion). For instance, a football league might adopt a rule that players must not "grab, twist, or pull a facemask, helmet, or other equipment with the intent to injure a player, or otherwise attack, assault, or harm any player." If a linebacker shouts insults at the quarterback and hurts his feelings, has the linebacker nonetheless followed the rule? Of course he has. The examples of prohibited actions all concern dangerous physical conduct that might inflict bodily harm; trash talk is simply not of that kind. See 64 F. 4th, at 365–366 (Katsas, J., dissenting).

Similarly improbable consequences can result from untethering an "otherwise" provision from the rest of a criminal statute. Take *Begay* v. *United States*, 553 U. S. 137 (2008) (abrogated on other grounds by *Johnson* v. *United States*, 576 U. S. 591 (2015)). The question there was whether driving under the influence qualified as a "violent felony" under the Armed Career Criminal Act (ACCA). A "violent felony" was defined in relevant part by ACCA as a crime, punishable by more than a year's imprisonment, that "'is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential

risk of physical injury to another.' "   553 U. S., at 139–140
(quoting 18 U. S. C. § 924(e)(2)(B)(ii) (2000 ed.)).   We recog-
nized that, depending on the context, "the word 'otherwise'
can"—though not "must"—"refer to a crime that is similar to
the listed examples in some respects but different in others."
553 U. S., at 144 (emphasis deleted).   And we held that while
driving under the influence certainly may present a serious
risk of physical injury, such an offense was so dissimilar from
the previously enumerated examples that it could not be
classified as a "violent felony" under the statute.   *Id.*, at
142–146.   The list of crimes that preceded the residual
clause—burglary, arson, extortion, and the use of explo-
sives—focused on "purposeful, violent, and aggressive con-
duct."   *Id.*, at 144–145 (internal quotation marks omitted).
And if that focus did not extend to the residual clause,
ACCA's 15-year mandatory minimum sentence would apply
to a host of offenses "not typically committed by those whom
one normally labels 'armed career criminals' " and that were
"far removed . . . from the deliberate kind of behavior associ-
ated with violent criminal use of firearms."[1]   *Id.*, at 146–
147.

   The "otherwise" provision of Section 1512(c)(2) is similarly
limited by the preceding list of criminal violations.   The of-
fenses enumerated in subsection (c)(1) cover someone who
"alters, destroys, mutilates, or conceals a record, document,
or other object . . . with the intent to impair the object's
integrity or availability for use in an official proceeding."
Complex as subsection (c)(1) may look, it simply consists of
many specific examples of prohibited actions undertaken
with the intent to impair an object's integrity or availability

_____

[1] The dissent explains that we subsequently held the ACCA residual
clause void for vagueness.   See *post*, at 512 (opinion of BARRETT, J.) (cit-
ing *Johnson* v. *United States*, 576 U. S. 591, 597 (2015)).   That our answer
to the narrow question presented in *Begay* did not resolve a broader con-
stitutional defect in the statute says little about whether the reasoning of
*Begay* is relevant here.

for use in an official proceeding: altering a record, altering a document, concealing a record, concealing a document, and so on. That list is followed immediately by a residual clause in (c)(2). Guided by the basic logic that Congress would not go to the trouble of spelling out the list in (c)(1) if a neighboring term swallowed it up, the most sensible inference is that the scope of (c)(2) is defined by reference to (c)(1).

If, as the Government asserts, (c)(2) covers "all forms of obstructive conduct *beyond* Section 1512(c)(1)'s focus on evidence impairment," Brief for United States 13, there would have been scant reason for Congress to provide any specific examples at all. The sweep of subsection (c)(2) would consume (c)(1), leaving that narrower provision with no work to do. Indeed, subsection (c)(1) would be an elaborate pump-fake: a list of four types of highly particularized conduct, performed with respect to a record, document, or object and "with the intent to impair the object's integrity or availability for use in an official proceeding," followed in the very next subsection—in the same sentence, no less—by a superseding prohibition on *all* means of obstructing, influencing, or impeding any official proceeding. Construing Section 1512 in such a way gets the "familiar" analysis we apply to these types of statutes "exactly backwards," eliminating specific terms because of broad language that follows them, rather than limiting the broad language in light of narrower terms that precede it. *Bissonnette*, 601 U. S., at 252, 255.

Tethering subsection (c)(2) to the context of (c)(1) recognizes the distinct purpose of each provision. See A. Scalia & B. Garner, Reading Law 208 (2012) ("evident purpose" helps define scope of catchall provision). As we have explained, subsection (c)(1) refers to a defined set of offense conduct—four types of actions that, by their nature, impair the integrity or availability of records, documents, or objects for use in an official proceeding. When the phrase "otherwise obstructs, influences, or impedes any official proceeding" is read as having been given more precise content by that nar-

rower list of conduct, subsection (c)(2) makes it a crime to impair the availability or integrity of records, documents, or objects used in an official proceeding in ways other than those specified in (c)(1). For example, it is possible to violate (c)(2) by creating false evidence—rather than altering incriminating evidence. See, *e. g.*, *United States* v. *Reich*, 479 F. 3d 179, 185–187 (CA2 2007) (Sotomayor, J.) (prosecution under subsection (c)(2) for transmitting a forged court order). Subsection (c)(2) also ensures that liability is still imposed for impairing the availability or integrity of *other* things used in an official proceeding beyond the "record[s], document[s], or other object[s]" enumerated in (c)(1), such as witness testimony or intangible information. See, *e. g.*, *United States* v. *Mintmire*, 507 F. 3d 1273, 1290 (CA11 2007) (prosecution under subsection (c)(2) based in part on the defendant's attempt to orchestrate a witness's grand jury testimony).

The dissent supposes that because the word "otherwise" in (c)(2) can mean "in a different manner," "by other means," or "in other respects," (c)(1) and (c)(2) are "distinct and independent prohibitions." *Post*, at 507, 510 (internal quotation marks omitted). But the word "otherwise" is not by itself "sufficient to demonstrate that the examples do not limit the scope of the clause." *Begay*, 553 U. S., at 144 (emphasis deleted). "Otherwise" *can* link a set of examples to a general phrase and give it more definite meaning—even in statutory sentences that rival the complexity of Section 1512(c). See *Finnegan* v. *Leu*, 456 U. S. 431, 437–438 (1982); *Breininger* v. *Sheet Metal Workers*, 493 U. S. 67, 91–92 (1989).

2

It makes sense to read subsection (c)(2) as limited by (c)(1) in light of the history of the provision.

Prior to the Sarbanes-Oxley Act, Section 1512 imposed criminal liability on anyone who "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person" to, among other things, shred documents. 18

U. S. C. § 1512(b)(2)(B) (2000 ed.).   But the Enron accounting scandal revealed a loophole: Although Enron's "outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents," the statute curiously failed to "impos[e] liability on a person who destroys records himself."   *Yates*, 574 U. S., at 535–536 (plurality opinion). As a result, prosecutors had to prove that higher-ups at Enron and Arthur Andersen persuaded someone else to shred documents rather than the more obvious theory that someone who shreds documents is liable for doing so.   See S. Rep. No. 107–146, p. 7 (2002).

The parties agree that to plug this loophole, Congress enacted Section 1512(c)—the provision at issue here—as part of the broader Sarbanes-Oxley Act.   It would be peculiar to conclude that in closing the Enron gap, Congress actually hid away in the second part of the third subsection of Section 1512 a catchall provision that reaches far beyond the document shredding and similar scenarios that prompted the legislation in the first place.   The better conclusion is that subsection (c)(2) was designed by Congress to capture other forms of evidence and other means of impairing its integrity or availability beyond those Congress specified in (c)(1).

## B

### 1

The broader context of Section 1512 in the criminal code confirms that (c)(2) is limited by the scope of (c)(1).   Federal obstruction law consists of numerous provisions that target specific criminal acts and settings.   See 18 U. S. C. ch. 73. Much of that particularized legislation would be unnecessary if (c)(2) criminalized essentially all obstructive conduct, as the Government contends.   Section 1503(a), for example, makes it a crime to "corruptly, or by threats or force, or by any threatening . . . communication, endeavor[ ] to influence, intimidate, or impede" any juror or court officer.   Section

1504 covers attempting to influence jurors through written communications.   Section 1505 covers anyone who corruptly obstructs congressional inquiries or investigations.   Section 1507 covers picketing or parading in certain locations "with the intent of interfering with, obstructing, or impeding the administration of justice."   Section 1509 covers the obstruction of the exercise of rights or performance of duties under court orders.   Section 1510(a) covers obstruction of federal criminal investigations through bribery.   Section 1511(a) covers certain obstruction of state or local law enforcement with the intent to facilitate illegal gambling.   And Sections 1516, 1517, and 1518 address obstructive acts in specific contexts, including federal audits, examinations of financial institutions, and inquiries into healthcare-related offenses.

If the Government were correct, then the "otherwise obstructs, influences, or impedes any official proceeding" provision—which is buried in subsection (c)(2) of Section 1512—would largely obviate the need for that broad array of other obstruction statutes.   In light of our obligation to give meaning where possible to each word and provision in the Code, *Taylor*, 529 U. S., at 404, our narrower interpretation of subsection (c)(2) is the superior one.

2

An unbounded interpretation of subsection (c)(2) would also render superfluous the careful delineation of different types of obstructive conduct in Section 1512 itself.   That section provides a reticulated list of nearly two dozen means of committing obstruction, with varying degrees of culpability and penalties ranging from three years to life in prison, or even death.   Section 1512(a)(2)(B)(iv), for example, authorizes up to 30 years' imprisonment for someone who uses or attempts to use physical force against another person with the intent of causing him to be absent from an official proceeding.   See § 1512(a)(3)(B)(ii) (specifying punishment).

Section 1512(d)(1), by contrast, authorizes only three years' imprisonment for someone who harasses another person and thereby dissuades him from attending an official proceeding.

Reading (c)(2) to cover all forms of obstructive conduct would override Congress's careful delineation of which penalties were appropriate for which offenses. Most instances of those prohibited acts would instead fall under subsection (c)(2)'s sweeping reach, which provides a 20-year maximum term of imprisonment. Such a reading of subsection (c)(2) would lump together disparate types of conduct for which Congress had assigned proportionate penalties in (a)(2) and (d)(1).[2]

3

The Government's responses to this surplusage problem are not convincing.

It first argues that because other provisions in Section 1512 would allow conviction in some circumstances on a "lesser mens rea than 'corruptly,'" they have "a broader compass" than (c)(2). Brief for United States 34. For instance, the Government contends that subsection (b) can be violated by "knowing use of intimidation or threats, or misleading conduct." *Id.*, at 35. But the Government concedes that "Congress did not define 'corruptly' for purposes of Section 1512." *Id.*, at 44. And while the Government suggests that "corruptly" is "'normally associated with wrongful, immoral, depraved, or evil' conduct," *ibid.* (quoting *Arthur Andersen LLP* v. *United States*, 544 U. S. 696, 705 (2005)), it never persuasively explains how "knowingly us[ing] intimi-

---

[2] The dissent maintains we have "'glosse[d] over the absence of any prescribed minimum.'" *Post*, at 519 (quoting *Yates*, 574 U. S., at 569 (KAGAN, J., dissenting)). Congress might have thought (c)(2) prohibited conduct of varying severity. But it does not follow that it designed (c)(2) to reach forms of conduct already covered in Chapter 73 with far lower maximum sentences. It would be improper to substitute for those fine-grained statutory distinctions the charging discretion of prosecutors and the sentencing discretion of district courts.

dation" or "threat[s]" against someone is not "wrongful." § 1512(b). The same is true for most other subparts of Section 1512 that the Government identifies as having a lesser *mens rea* than (c)(2). Brief for United States 34; see, *e. g.*, § 1512(a)(1)(A) (criminalizing anyone who "kills or attempts to kill another person, with intent to" prevent attendance in an official proceeding); § 1512(a)(2)(B)(iv) (criminalizing anyone who "uses physical force . . . against any person" intending to cause them to be absent from an official proceeding). None of those other provisions has a *mens rea* the Government may more readily establish than the "corruptly" *mens rea* of subsection (c)(2).

The Government also contends that its interpretation creates no surplusage because Section 1512's other "provisions sweep more broadly than an official proceeding." Tr. of Oral Arg. 64; Brief for United States 34. To be sure, subsections (a)(2)(C), (b)(3), and (d)(2) criminalize various means of preventing someone from giving a judge or law enforcement officer information relating to the commission or possible commission of a federal offense or a violation of conditions of supervised release. And subsections (d)(3) and (4) make it a crime to harass someone and thereby dissuade them from arresting or prosecuting a person alleged to have committed a federal offense. None of these crimes requires an "official proceeding." But not much if any conduct covered by those provisions would escape the Government's expansive interpretation of subsection (c)(2). For a person to have violated (c)(2), "an official proceeding need not be pending or about to be instituted." § 1512(f)(1). And because interference with an arrest or with communications to authorities about federal offenses could very well obstruct the initiation of future official proceedings, the Government's reading of (c)(2) would still often consume violations of (a)(2)(C), (b)(3), and (d)(2), (3), and (4).

The dissent tries to solve this surplusage problem by arguing that conduct only violates (c)(2) if it has a "'relation-

ship in time, causation, or logic' " with an official proceeding. *Post*, at 516 (quoting *United States* v. *Aguilar*, 515 U. S. 593, 599 (1995)). Assuming there is such a requirement, it would simply mean that the defendant's actions "must have the natural and probable effect" of interfering with the proceeding. *Id.*, at 599 (internal quotation marks omitted). Such a bar on prosecutions based on "speculative" theories of obstruction, *id.*, at 601, would hardly cabin the reach of (c)(2).

The dissent points out that our reading creates some surplusage, too. See *post*, at 517. In a wide-ranging scheme like Chapter 73, it is true that some provisions will inevitably cover some of the same conduct. But "surplusage is nonetheless disfavored," and our "construction that creates substantially less of it is better than a construction that creates substantially more." 64 F. 4th, at 374 (Katsas, J., dissenting).

## III

On the Government's theory, Section 1512(c) consists of a granular subsection (c)(1) focused on obstructive acts that impair evidence and an overarching subsection (c)(2) that reaches all other obstruction. Even setting surplusage aside, that novel interpretation would criminalize a broad swath of prosaic conduct, exposing activists and lobbyists alike to decades in prison. As the Solicitor General acknowledged at oral argument, under the Government's interpretation, a peaceful protester could conceivably be charged under § 1512(c)(2) and face a 20-year sentence. Tr. of Oral Arg. 51–52. And the Government would likewise have no apparent obstacle to prosecuting under (c)(2) any lobbying activity that "influences" an official proceeding and is undertaken "corruptly." Those peculiar results "underscore[ ] the implausibility of the Government's interpretation." *Van Buren* v. *United States*, 593 U. S. 374, 394 (2021).

Our usual approach in obstruction cases has been to "resist reading" particular sub-provisions "to create a coverall" statute, as the Government would have us do here. *Yates*,

574 U. S., at 549 (plurality opinion); see also *Marinello* v.
*United States*, 584 U. S. 1, 6–11 (2018); *Arthur Andersen*, 544
U. S., at 703–704. And there is no reason to depart from
that practice today. Nothing in the text or statutory history
suggests that subsection (c)(2) is designed to impose up to 20
years' imprisonment on essentially all defendants who com-
mit obstruction of justice in any way and who might be sub-
ject to lesser penalties under more specific obstruction stat-
utes. See, *e. g.*, §§ 1503(b)(3), 1505. If Congress had wanted
to authorize such penalties for *any* conduct that delays or
influences a proceeding in *any* way, it would have said so.
Instead, Section 1512 mentions "record," "document," or
other "object" 26 times. See 18 U. S. C. §§ 1512(a)(1)(B),
(a)(2)(B)(i), (ii), (iii), 1512(b)(2)(A), (B), (C), 1512(c)(1), 1512(f).

Rather than transforming this evidence-focused statute
into a one-size-fits-all solution to obstruction of justice, we
cabin our reading of subsection (c)(2) in light of the context
of subsection (c)(1). Doing so affords proper respect to "the
prerogatives of Congress" in carrying out the quintessen-
tially legislative act of defining crimes and setting the penal-
ties for them. *Aguilar*, 515 U. S., at 600. We have long rec-
ognized that "the power of punishment is vested in the
legislative, not in the judicial department," *United States* v.
*Wiltberger*, 5 Wheat. 76, 95 (1820), and we have as a result
"'traditionally exercised restraint in assessing the reach of
a federal criminal statute,'" *Marinello*, 584 U. S., at 11 (quot-
ing *Aguilar*, 515 U. S., at 600). The Government's reading
of Section 1512 would intrude on that deliberate arrange-
ment of constitutional authority over federal crimes, giving
prosecutors broad discretion to seek a 20-year maximum sen-
tence for acts Congress saw fit to punish only with far
shorter terms of imprisonment—for example, three years for
harassment under § 1512(d)(1), or ten years for threatening a
juror under § 1503.

For all these reasons, subsection (c)(2)'s "surrounding
words" suggest that we should not give this "otherwise" pro-

vision the broadest possible meaning. *Yates*, 574 U. S., at 536 (plurality opinion). Although the Government's all-encompassing interpretation may be literally permissible, it defies the most plausible understanding of why (c)(1) and (c)(2) are conjoined, and it renders an unnerving amount of statutory text mere surplusage. Given that subsection (c)(2) was enacted to address the Enron disaster, not some further flung set of dangers, it is unlikely that Congress responded with such an unfocused and "grossly incommensurate patch." 64 F. 4th, at 376 (Katsas, J., dissenting). We therefore decline to adopt the Government's interpretation, which is inconsistent with "the context from which the statute arose." *Bond* v. *United States*, 572 U. S. 844, 860 (2014).

\* \* \*

To prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or attempted to do so. See *supra*, at 491. The judgment of the D. C. Circuit is therefore vacated, and the case is remanded for further proceedings consistent with this opinion. On remand, the D. C. Circuit may assess the sufficiency of Count Three of Fischer's indictment in light of our interpretation of Section 1512(c)(2).

*It is so ordered.*

JUSTICE JACKSON, concurring.

On January 6, 2021, an angry mob stormed the United States Capitol seeking to prevent Congress from fulfilling its constitutional duty to certify the electoral votes in the 2020 Presidential election. See *ante*, at 484. The peaceful transfer of power is a fundamental democratic norm, and those who attempted to disrupt it in this way inflicted a deep wound on this Nation. But today's case is not about the immorality of those acts. Instead, the question before this

Court is far narrower: What is the scope of the particular crime Congress has outlined in 18 U. S. C. § 1512(c)(2)?

In the United States of America, "men are not subjected to criminal punishment because their conduct offends our patriotic emotions or thwarts a general purpose sought to be effected by specific commands which they have not disobeyed. Nor are they to be held guilty of offenses which the statutes have omitted, though by inadvertence, to define and condemn." *Viereck* v. *United States*, 318 U. S. 236, 245 (1943). Our commitment to equal justice and the rule of law requires the courts to faithfully apply criminal laws as written, even in periods of national crisis, see, *e. g., Cramer* v. *United States*, 325 U. S. 1, 46–48 (1945), and even when the conduct alleged is indisputably abhorrent, cf. *Michaels* v. *Davis*, 601 U. S. ——, —— (2024) (JACKSON, J., dissenting from denial of certiorari).

Notwithstanding the shocking circumstances involved in this case or the Government's determination that they warrant prosecution, today, this Court's task is to determine what conduct is proscribed by the criminal statute that has been invoked as the basis for the obstruction charge at issue here. I join in the Court's opinion because I agree with the majority that § 1512(c)(2) does not reach "'all forms of obstructive conduct'" and is, instead, "limited by the preceding list of criminal violations" in § 1512(c)(1). *Ante*, at 489–490. I write separately to explain why and how that interpretation of § 1512(c) follows from the legislative purpose that this statute's text embodies.

I

Our goal in interpreting any statute should be "to give effect to the intent of Congress." *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 542 (1940). There is no question that intent is generally expressed through the text of a statute. See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982). "[H]ewing closely to Congress's will" as embodied in the statute that it wrote "is especially

important" when construing laws like this one, which impli-
cate the possible imposition of punitive sanctions.    *Pugin* v.
*Garland*, 599 U. S. 600, 612 (2023) (JACKSON, J., concurring).

Here, the majority rightly interprets the scope of
§ 1512(c)(2) by "look[ing] for guidance from" the statutory
"examples [that] come before" it—those listed in § 1512(c)(1).
*Ante,* at 487.    In my view, the examples that Congress opts
to include in the text of a statute evince its intentions con-
cerning what the rule covers and thereby help express a par-
ticular legislative purpose.

The majority's football-based example is illustrative.    In a
football league, says the majority, "a rule that players must
not 'grab, twist, or pull a facemask, helmet, or other equip-
ment with the intent to injure a player, or otherwise attack,
assault, or harm any player,'" should not be interpreted as
being directed at hurt feelings, because the listed "prohibited
actions all concern dangerous physical conduct that might
inflict bodily harm; trash talk is simply not of that kind."
*Ante,* at 488.    I agree.    I would add that it is likewise clear
from the listed prohibited acts that such a rule is also not
addressing far more serious and unexpected conduct than
the kinds of acts that the preceding examples describe,
which can result in serious and foreseeable physical injuries
during a rough-and-tumble football game.    By contrast, if a
player were to shoot or poison another player, the rule's
drafters would expect the police to be called, not a referee.
Thus, we conclude that the rule is best understood to be in-
apposite with respect to conduct at both extremes of the uni-
verse of harmful acts in which a player might conceivably
engage.

We recognize this intuitive fact—that there is a certain
category of conduct the rule is designed to prohibit—because
we recognize, albeit implicitly, that the drafters of this rule
have included these particular examples *for a reason*.    We
understand that, given the preceding list of examples, this
rule was adopted with a clear intent concerning its scope.

JACKSON, J., concurring

So, though a broad conception of "harm" is "literally covered by the language" of the rule, *ibid.*, we appreciate that the rule's drafters did not intend for that term to take on its most expansive meaning.   Instead, the examples help illuminate what the drafters actually intended the rule to cover. From the preceding list, we can confidently discern that the drafters meant to proscribe only conduct that risks injuries with severity akin to facemask pulling, not trash talk or murder.[1]

The upshot is that, when interpreting the scope of a particular statute or rule, our assessment of the words that the drafters used informs our understanding of what the rule was designed to do.[2]   Discerning the rule's purpose is critical when a court is called upon to interpret the provision.

## II

Turning to the statutory provision at issue here, the purpose of § 1512(c), reflected in its text, is clear.   Subsection (c)(1) is indisputably focused on persons who engage in a particular kind of obstructive conduct: Anyone who "corruptly

---

[1] The majority invokes the canons of *noscitur a sociis* and *ejusdem generis* to support this inference.   See *ante*, at 487.   Those canons are useful interpretive tools, but in my view, they are ultimately only devices used in furtherance of achieving our goal of determining "the intent of Congress." *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 542 (1940). "There is no invariable rule for the discovery of that intention."   *Ibid.* As one treatise explains, such canons are "not . . . rule[s] of law" but rather "one of various factors to be considered."   A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 212 (2012); see also *id.*, at 196– 198.   We apply these canons because we understand that their principles are consistent with how users of language—including legislators—convey meaning.   See *id.*, at 212 ("Any lawyer or legislative drafter who writes two or more specifics followed by a general residual term without the intention that the residual term be limited may be guilty of malpractice"). As such, they are valid indicia of Congress's purpose.

[2] Other indicia of the drafters' intent, such as the rule's context or enactment history, can further inform our understanding of the rule.   See *infra*, at 502–505.

. . . alters, destroys, mutilates, or conceals a record, document, or other object, . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Subsection (c)(2), in turn, is directed at criminal conduct that "otherwise" achieves a similar result. I therefore agree with the majority that § 1512(c)(2)'s reach is narrower than the Government contends. As the majority holds, § 1512(c)(2) "makes it a crime to impair the availability or integrity of records, documents, or objects used in an official proceeding in ways other than those specified in (c)(1)" and to "impai[r] the availability or integrity of *other* things used in an official proceeding beyond the 'record[s], document[s], or other object[s]' enumerated in (c)(1)." *Ante*, at 491.

This understanding of § 1512(c)'s text and purpose is entirely consistent with the statute's enactment history. Congress enacted § 1512(c) as part of the Sarbanes-Oxley Act, which "was prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents." *Yates* v. *United States*, 574 U. S. 528, 535–536 (2015) (plurality opinion). When introducing what later became § 1512(c) on the Senate floor, Senator Lott emphasized that its principal purpose was to target document destruction, which was, at the time, prohibited "only if . . . a subpoena ha[d] been issued for the evidence that ha[d] been destroyed or altered." 148 Cong. Rec. 12512 (2002). "[T]his section," he explained, "would allow the Government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena." *Ibid.* Similarly, the Senate Report accompanying the proposed statute noted that "current federal obstruction of justice statutes relating to document destruction [were] riddled with loopholes and burdensome proof requirements." S. Rep. No. 107–146, p. 6 (2002). According to the Senate Re-

JACKSON, J., concurring

port, § 1512(c) was drafted to fill these gaps: "When a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency, overly technical legal distinctions should neither hinder nor prevent prosecution and punishment."  *Id.*, at 7.

Conversely, there is no indication whatsoever that Congress intended to create a sweeping, all-purpose obstruction statute.  As the majority notes, "[f]ederal obstruction law consists of numerous provisions that target specific criminal acts and settings."  *Ante*, at 492.  Outside of the Government's proposed interpretation of § 1512(c), Congress has never enacted "a one-size-fits-all solution to obstruction of justice."  *Ante*, at 497.[3]  Meanwhile, many States have done just that.  See J. Decker, The Varying Parameters of Obstruction of Justice in American Criminal Law, 65 La. L. Rev. 49, 77, and n. 236 (2004) (collecting statutes).[4]  The drafters of the Model Penal Code, too, proposed such a general obstruction crime.  See ALI, Model Penal Code § 242.1, p. 201 (1980) ("A person commits a misdemeanor if he purposely obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act").

---

[3] That is not to say, of course, that Congress could not enact such a statute if it so chose.  "We have traditionally exercised restraint in assessing the reach of a federal criminal statute . . . out of deference to the prerogatives of Congress," *United States* v. *Aguilar*, 515 U. S. 593, 600 (1995), not because broad criminal proscriptions are beyond the scope of Congress's power.

[4] See also, *e. g.*, Colo. Rev. Stat. § 18–8–102(1) (2023) ("A person commits obstructing government operations if he intentionally obstructs, impairs, or hinders the performance of a governmental function by a public servant, by using or threatening to use violence, force, or physical interference or obstacle"); Ohio Rev. Code Ann. § 2921.31(A) (Lexis 2024) ("No person . . . shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties").

Given that Congress has never before passed a similarly broad obstruction law when others have long existed, it is highly unlikely that Congress intended for subsection (c)(2) to establish a first-of-its-kind general federal obstruction crime. Nothing in the enactment history of § 1512(c) suggests that Congress believed that it was creating an all-encompassing statute that would obviate the need for any other obstruction prohibitions.

This conclusion is further reinforced by the fact that, unlike § 1512(c)(2), nearly all of the broad, all-purpose obstruction statutes that various States have enacted are classified as misdemeanors. See, *e. g.*, Colo. Rev. Stat. § 18–8–102(3) (2023); Ohio Rev. Code Ann. 2921.31(B) (Lexis 2024). As a result, these types of obstruction crimes are generally punishable by up to a year of incarceration. See 1 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 1.8(c), pp. 557–558 (4th ed. 2015). That is so for a reason: As the Model Penal Code's drafters explained, "the existence of a residual misdemeanor offense" allows for the "appropriately narrow definition of the serious forms of obstruction carrying felony penalties." § 242.1, Comment 2, at 203. "A broad residual offense . . . provides a hedge against the ingenuity of offenders," since "[n]ot all forms of obstruction can be anticipated and precisely proscribed in specific offenses." *Ibid.* But, at the same time, that kind of broad criminal statute "must incorporate certain limitations lest it nullify policy decisions expressed elsewhere." *Ibid.* In other words, these broad misdemeanor obstruction statutes are "amalgam[s] of generality and constraint." *Ibid.*

The Government's interpretation of § 1512(c)(2), by contrast, exhibits all the generality of these catchall misdemeanor obstruction provisions while displaying none of their restraint. Section 1512(c)(2) is a felony, and it imposes a 20-year maximum sentence—one of the more severe potential punishments in Chapter 73 of the U. S. Code. That stands in contrast with Congress's specification that other

serious obstructive acts warrant "far shorter terms of imprisonment—for example, three years for harassment under § 1512(d)(1), or ten years for threatening a juror under § 1503." *Ante,* at 497.

Finally, it is worth remembering the statutory context in which Congress chose to prohibit the obstruction-related conduct we are considering today. The statute Congress wrote addresses this matter in a 13-word phrase, enumerated "2," that is located within subsection (c) of a much broader § 1512, which itself consists of "a reticulated list of nearly two dozen means of committing obstruction." *Ante,* at 493. However we might interpret Congress's drafting choices in other contexts, we should be wary of finding that a statute addresses significant criminal conduct when none of the available indicia of congressional intent, including the prohibition's placement, suggest that Congress intended that result. Here, it beggars belief that Congress would have inserted a breathtakingly broad, first-of-its-kind criminal obstruction statute (accompanied by a substantial 20-year maximum penalty) in the midst of a significantly more granular series of obstruction prohibitions without clarifying its intent to do so—not in the text of the provision itself, nor in the surrounding statutory context, nor in any statement issued during the enactment process.

\* \* \*

In my view, the Court properly interprets § 1512(c)(2) in the opinion it issues today. It also rightly vacates the judgment below and remands this case for further proceedings. Joseph Fischer was charged with violating § 1512(c)(2) by corruptly obstructing "a proceeding before Congress, specifically, Congress's certification of the Electoral College vote." App. 183. That official proceeding plainly used certain records, documents, or objects—including, among others, those relating to the electoral votes themselves. See Tr. of Oral Arg. 65–67. And it might well be that Fischer's

conduct, as alleged here, involved the impairment (or the attempted impairment) of the availability or integrity of things used during the January 6 proceeding "in ways other than those specified in (c)(1)." *Ante*, at 491. If so, then Fischer's prosecution under § 1512(c)(2) can, and should, proceed. That issue remains available for the lower courts to determine on remand.

JUSTICE BARRETT, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Joseph Fischer allegedly joined a mob of rioters that breached the Capitol on January 6, 2021. At the time, Congress was meeting in a joint session to certify the Electoral College results. The riot forced Congress to suspend the proceeding, delaying it for several hours.

The Court does not dispute that Congress's joint session qualifies as an "official proceeding"; that rioters delayed the proceeding; or even that Fischer's alleged conduct (which includes trespassing and a physical confrontation with law enforcement) was part of a successful effort to forcibly halt the certification of the election results. Given these premises, the case that Fischer can be tried for "obstructing, influencing, or impeding an official proceeding" seems open and shut. So why does the Court hold otherwise?

Because it simply cannot believe that Congress meant what it said. Section 1512(c)(2) is a very broad provision, and admittedly, events like January 6th were not its target. (Who could blame Congress for that failure of imagination?) But statutes often go further than the problem that inspired them, and under the rules of statutory interpretation, we stick to the text anyway. The Court, abandoning that approach, does textual backflips to find some way—*any* way—to narrow the reach of subsection (c)(2). I respectfully dissent.

I

The case for the Government's interpretation is straightforward. It can be accomplished in three paragraphs, as compared to the Court's many, many more. *Ante*, at 486–494.

Start with the verbs: To "obstruct" and to "impede" mean to "hinder" or "retard" something's "passage" or "progress." 10 Oxford English Dictionary 668 (2d ed. 1989); 7 *id.*, at 705. We have previously explained that these words are "broad." *Marinello* v. *United States*, 584 U. S. 1, 7 (2018). To "influence" is similarly expansive, meaning "[t]o affect the condition of" or "to have an effect on" something. 7 Oxford English Dictionary, at 940. The object of these verbs is an "official proceeding," defined to include "a proceeding before the Congress." 18 U. S. C. §1515(a)(1)(B).[1] So (c)(2) covers all sorts of actions that affect or interfere with official proceedings.

"[O]therwise," which introduces 18 U. S. C. §1512(c)(2), does not narrow its scope. "Otherwise" means "in a different manner," "by other means," or "in other respects." 10 Oxford English Dictionary, at 984; Webster's Third New International Dictionary 1598 (2002). It is often used to introduce a "catchall phras[e]." *Texas Dept. of Housing and Community Affairs* v. *Inclusive Communities Project*, 576 U. S. 519, 535 (2015). Here, "otherwise" tells the reader how (c)(1) and (c)(2) fit together. Subsection (c)(1) prohibits "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object" with "intent to impair [its] integrity or availability for use in an official proceeding." In other words, (c)(1) targets document and object spoliation— classic means of obstruction. Subsection (c)(2) then prohibits obstructing, influencing, or impeding an official proceeding by means *different* from those specified in (c)(1), thereby serving as a catchall. The "enumerated" crimes in (c)(1) and the "unenumerated crimes" in (c)(2) are similar "on one specific dimension": "the *particular* similarity specified after the 'otherwise.'" *Begay* v. *United States*, 553 U. S. 137, 150– 151 (2008) (Scalia, J., concurring in judgment). Here, that

---

[1] The D. C. Circuit held, and this Court does not dispute, that Congress's joint session on January 6, 2021, qualifies as an "'official proceeding.'" 64 F. 4th 329, 342 (2023).

means that each crime represents one means through which to obstruct, influence, or impede an official proceeding.

Joseph Fischer allegedly participated in a riot at the Capitol that forced the delay of Congress's joint session on January 6th. Blocking an official proceeding from moving forward surely qualifies as obstructing or impeding the proceeding by means *other than* document destruction. Fischer's alleged conduct thus falls within (c)(2)'s scope.

## II

## A

Opting for a narrower approach, the Court declines to take (c)(2) on its own terms. Instead, it borrows the evidentiary focus of (c)(1) to hold that a defendant violates (c)(2) only by "impair[ing] the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding." *Ante,* at 498. Other means of obstructing a proceeding—say, by shutting it down—are out.

This interpretation might sound faithful to the statute, because the limit comes from a related provision rather than thin air. But snipping words from one subsection and grafting them onto another violates our normal interpretive principles. "'[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.'" *Dean* v. *United States,* 556 U. S. 568, 572 (2009) (quoting *Bates* v. *United States,* 522 U. S. 23, 29 (1997)). And "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act,'" we generally presume that Congress did so intentionally. *Russello* v. *United States,* 464 U. S. 16, 23 (1983) (quoting *United States* v. *Wong Kim Bo,* 472 F. 2d 720, 722 (CA5 1972) (*per curiam*)). The Court's reasons for departing from these rules are thin.

## 1

The Court begins with the *noscitur a sociis* and *ejusdem generis* canons. *Ante,* at 487. The *noscitur* canon counsels

that "words grouped in a list should be given related meanings." A. Scalia & B. Garner, Reading Law §31, p. 195 (2012) (internal quotation marks omitted). It is particularly useful when interpreting "'a word [that] is capable of many meanings.'" *McDonnell* v. *United States*, 579 U. S. 550, 569 (2016) (quoting *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961)). See, *e. g.*, *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 573–575 (1995) (employing the canon to interpret "communication" in the statutory list "'prospectus, notice, circular, advertisement, letter, or communication'"). The *ejusdem* canon applies when "a catchall phrase" follows "an enumeration of specifics, as in *dogs*, *cats*, *horses*, *cattle*, and *other animals*." Scalia & Garner §32, at 199. We often interpret the catchall phrase to "embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 115 (2001). See, *e. g.*, *Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 375, 385 (2003) (employing the canon to construe the general term in the statutory list "'execution, levy, attachment, garnishment, or other legal process'").

These canons are valuable tools. But applying either to (c)(2) is like using a hammer to pound in a screw—it looks like it might work, but using it botches the job. Unlike the pattern to which the *noscitur* canon applies, §1512(c) is not a list of terms that includes an ambiguous word. So the Court does not do what it does when applying *noscitur*: select between multiple accepted meanings of the words "obstructs," "influences," and "impedes." Instead, it modifies those words by adding an adverbial phrase: obstructs, influences or impedes by "*impair[ing] the availability or integrity for use in an official proceeding of records, documents, [or] objects*." *Ante*, at 498 (emphasis added). The *ejusdem* canon is an equally poor fit. Unlike the pattern to which *ejusdem* applies, (c)(2) is "*not* a general or collective term following a list of specific items to which a particular statu-

tory command is applicable." *United States* v. *Aguilar*, 515 U. S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting in part). Instead, (c)(1) and (c)(2) are "distinct and independent prohibitions." *Ibid.* Though they share a subject and an adverb—"[w]hoever corruptly"—the two clauses contain different verbs that take different objects. § 1512(c). Moreover, (c)(1) has a separate *mens rea* provision that further disrupts the connection between the clauses.

To my knowledge, we have never applied either of these canons to a statute resembling § 1512(c). Rather than identify such a case, the Court invents examples of a sign at the zoo and a football league rule. *Ante*, at 487–488. The zoo example ("do not pet, feed, yell or throw objects at the animals, or otherwise disturb them") does not help, because it mimics the typical *ejusdem* format of specific words followed by a catchall. The list of specific verbs makes clear that the cleanup phrase ("otherwise disturb") is limited to conduct that involves direct interaction with the animals. But in the absence of a laundry list followed by a catchall, it is hard to see why the *ejusdem* canon fits. *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 225 (2008) ("The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase"). And § 1512(c) does not follow the laundry-list-plus-catchall pattern.

The Court's football example is only slightly better. As a refresher:

> "[A] football league might adopt a rule that players must not 'grab, twist, or pull a facemask, helmet, or other equipment with the intent to injure a player, or otherwise attack, assault, or harm any player.' If a linebacker shouts insults at the quarterback and hurts his feelings, has the linebacker nonetheless followed the rule? Of course he has. The examples of prohibited

BARRETT, J., dissenting

> actions all concern dangerous physical conduct that might inflict bodily harm; trash talk is simply not of that kind." *Ante*, at 488.

Put aside that it is hard to imagine anyone describing "trash talk" as inflicting an "injury" or "harming" a player in a football game. The league rule plainly forecloses the possibility. Consistent with the *noscitur* canon, "harm" takes its meaning from its companions "attack" and "assault." And while the Court tries to track § 1512(c)'s structure by adding an extra intent clause, the two clauses in its example are still tightly focused on actions directed at the *player*. (After all, who is wearing the facemask, helmet, or other equipment?) Given that shared theme, it is easy to understand that the first clause's focus on physical conduct limits the (only slightly) more general clause. But § 1512(c)'s subsections are not so closely related—(c)(1) focuses specifically on objects in a proceeding, and (c)(2) broadens the lens to the proceeding itself.

Consider a rule that actually mirrors § 1512(c):

> "Any player who:
>    "(1) punches, chokes, or kicks an opposing player with the intent to remove him from the game; or
>    "(2) otherwise interrupts, hinders, or interferes with the game, "shall be suspended."

While the specific verbs in the first clause involve actions directed at an opposing player, the second clause is a separate prohibition with an entirely different object. Imagine that, just before the opposing team's kicker attempts a field goal, players leave the sidelines and storm the field, some tackling referees in the process. Those players have surely "interrupt[ed], hinder[ed], or interfer[ed] with the game," even though they have not physically injured any opponent. *This* hypothetical, not the Court's, is analogous to § 1512(c)—and it supports the Government's interpretation.

2

The Court next recruits help from *Begay,* which interprets an "otherwise" clause in the Armed Career Criminal Act. *Ante*, at 488; 553 U. S., at 140. The ACCA defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury." 18 U. S. C. §924(e)(2)(B)(ii). *Begay* holds that the example crimes limit the catchall clause to "crimes that are roughly similar . . . to the examples themselves." 553 U. S., at 143. So too here, the Court reasons, the list of crimes in (c)(1) limits the "otherwise" clause in (c)(2).

But §1512(c) is structured differently than the statute in *Begay.* While §1512(c) contains two distinct criminal prohibitions—(c)(1) and (c)(2)—the statutory definition in *Begay* contained a list of examples followed immediately by a residual clause. The latter structure more readily supports interpreting the general clause in light of the specifics, much like a statute to which the *ejusdem* canon would apply. Moreover, the residual clause at issue in *Begay* called out for a limiting principle—what is a "serious potential risk of physical injury?" The breadth itself was a cue that the interpreter should read back to find some limit. See *id.*, at 142–143. Subsection (c)(2)'s "otherwise" clause, by contrast, stands on its own.

Postscript: Seven years after *Begay* was decided, we held ACCA's residual clause void for vagueness. *Johnson* v. *United States*, 576 U. S. 591, 597 (2015). So the clause is not only distinguishable, but also a poor model for statutory interpretation.

3

The Court argues that "there would have been scant reason for Congress to provide any specific examples" in (c)(1) if (c)(2) covered *all* forms of obstructive conduct. *Ante*, at 490. Conduct like destroying and concealing records "ob-

structs, influences, or impedes a[n] official proceeding," so Congress could have enacted just (c)(2) and been done with it. On the Government's interpretation, the Court asserts, the second prohibition swallows the first. If (c)(1) has any function, it must be to cast light (and impose limits) on (c)(2).

What the Court does *not* say is that its rewrite also eliminates the need for (c)(1)'s examples. The Court's interpretation assumes that Congress used a convoluted, two-step approach to enact a prohibition on "impair[ing] the integrity or availability of records, documents, or objects for use in an official proceeding." *Ante*, at 490. So why didn't Congress just say that? And if the Court is right about what (c)(2) means, why do we need the specific examples in (c)(1)? Those acts are already covered. The problem of (c)(2) subsuming (c)(1) is therefore not unique to my theory.

It bears emphasis, though, that the broad overlap makes sense, given the statute's backstory. When the Enron scandal occurred, Congress (along with the general public) was taken aback to discover that seemingly criminal conduct was actually not a federal crime. As it then existed, § 1512 had a loophole: It imposed liability on those who persuaded *others* to destroy documents, but not on the people who *themselves* destroyed documents. *Ante*, at 491–492. Congress enacted § 1512(c) to close this "Enron gap." Subsection (c)(1) deals with the particular problem at hand—document destruction. Subsection (c)(2) reflects Congress's desire to avoid future surprises: It is "a catchall for matters not specifically contemplated—known unknowns." *Republic of Iraq* v. *Beaty*, 556 U. S. 848, 860 (2009).

So contrary to the Court's suggestion, it would not be "peculiar" for (c)(2) to cover conduct "far beyond the document shredding and similar scenarios that prompted the legislation in the first place." *Ante*, at 492. Enron exposed more than the need to prohibit evidence spoliation—it also exposed the need to close statutory gaps. And in any event, statutes often reach beyond the "principal evil" that ani-

mated them.  *Oncale* v. *Sundowner Offshore Services, Inc.*,
523 U. S. 75, 79 (1998).  That is not grounds for narrowing
them, because "it is ultimately the provisions of our laws
rather than the principal concerns of our legislators by which
we are governed."  *Ibid.*

4

While the Court insists that (c)(1) limits (c)(2), it cannot
seem to settle on the "common attribute" in the first subsec-
tion that cabins the second.  See *Ali*, 552 U. S., at 225.  On
one hand, the Court says that "(c)(2) makes it a crime to
impair the availability or integrity of *records, documents, or
objects* used in an official proceeding."  *Ante*, at 491 (empha-
sis added).  This "physical evidence" limitation tracks the
District Court's interpretation.  See *United States* v. *Miller*,
589 F. Supp. 3d 60, 78 (DC 2022).  On the other hand, the
Court says that (c)(2) prohibits "impairing the availability or
integrity of *other* things used in an official proceeding," such
as "witness testimony" or "intangible information."  *Ante*,
at 491.  This broader "evidence impairment" theory resem-
bles Judge Katsas's interpretation.  64 F. 4th 329, 363
(CADC 2023) (dissenting opinion).

Both formulations are problematic—and not only because
both are atextual.  The first, focused solely on physical
items, would leave (c)(2) with almost no work to do.  Subsec-
tion (c)(1) already prohibits "alter[ing], destroy[ing], mutilat-
[ing], or conceal[ing]" documents, records, or objects.  This
essentially covers the waterfront of acts that impair the
integrity or availability of objects.  True, (c)(2) could also
encompass "cover[ing] up, falsif[ying], or mak[ing] a false
entry in" a record or document.  See 18 U. S. C. § 1519.  But
it seems "unlikely" that Congress used the "expansive" lan-
guage of (c)(2) "to address such narrow concerns."  64
F. 4th, at 344.  The somewhat amorphous "other things" lim-
itation has the benefit of giving (c)(2) a wider berth, but it is
unclear how the Court landed on it.  The term does not ap-
pear in (c)(1) or in § 1512's surrounding subsections, which

refer specifically to records, documents, objects, and testimony. The "other things" formulation comes from the Court, not Congress.

The Court's uncertainty about the relevant "common attribute" is a tell that Congress did not intend to define (c)(2) by reference to (c)(1). Indeed, "[h]ad Congress intended to limit [§ 1512(c)(2)]'s reach" as the Court asserts, it "easily could have written" the catchall to say "otherwise impair the integrity or availability of records, documents, objects, or other things for use in an official proceeding." *Ali*, 552 U. S., at 227; see *ante*, at 491.[2] It did not, and we should not pretend that it did.

B

The Court relies on statutory context to "confir[m] that (c)(2) is limited by the scope of (c)(1)." *Ante*, at 492. As the Court sees it, interpreting (c)(2) according to its plain text would render other obstruction provisions, within § 1512 and throughout Chapter 73, superfluous. *Ante*, at 492–494.

The Court exaggerates. Subsection (c)(2) applies only to conduct that obstructs an "official proceeding." The Court highlights several provisions that cover obstruction of *investigations*. See, *e. g.*, 18 U. S. C. §§ 1510(a), 1511(a), 1516, 1517, 1518, 1519. The circuits have held that criminal investigations do not qualify as "official proceedings." See, *e. g.*, *United States* v. *Ermoian*, 752 F. 3d 1165, 1172 (CA9 2013); *United States* v. *Ramos*, 537 F. 3d 439, 463 (CA5 2008). Likewise, not every provision in § 1512 relates to an official proceeding; instead, several target the obstruction of communications to judges and law enforcement about the com-

---

[2] Indeed, Congress could have looked to 18 U. S. C. § 1505 as a model. That statute makes it a crime to "willfully withhol[d], misrepresen[t], remov[e] from any place, concea[l], cove[r] up, destro[y], mutilat[e], alte[r], *or by other means falsif[y]* any documentary material, answers to written interrogatories, or oral testimony" with the intent to obstruct "any civil investigative demand." § 1505 (emphasis added).

mission of federal offenses.   18 U. S. C. §§ 1512(a)(1)(C), (a)(2)(C), (b)(3), (d)(1), (2).

The Court responds by stressing that for purposes of § 1512, "an official proceeding need not be pending or about to be instituted." § 1512(f)(1); *ante*, at 495.  Because obstruction of investigations or communications could end up obstructing the initiation of a future official proceeding, the Court reasons that (c)(2) may still swallow those other provisions.  But we have previously construed federal obstruction offenses similar to § 1512(c) to require a tighter link between the obstructive conduct and the relevant proceeding.  Under the "nexus" requirement, the defendant's conduct must have a "relationship in time, causation, or logic" with the proceeding.  *Aguilar*, 515 U. S., at 599 (adopting nexus requirement for § 1503's omnibus clause).  And the defendant must act in "contemplation" of a "particular official proceeding."  *Arthur Andersen LLP* v. *United States*, 544 U. S. 696, 708 (2005) (adopting nexus requirement for § 1512(b)(2)).  The circuits have unanimously applied this requirement to § 1512(c).  See *United States* v. *Young*, 916 F. 3d 368, 386 (CA4 2019) (collecting cases).  This element eliminates much of the overlap that the Court perceives between (c)(2) and the provisions that do not require an "official proceeding."

Moreover, §§ 1512(a)(1)(A) and (d)(1) prohibit preventing the mere attendance of any person in an official proceeding.  Preventing attendance will not always have the effect of obstructing, influencing, or impeding the proceeding.  And § 1512(d)(1) makes it a crime to *intentionally* harass someone and thereby dissuade her from testifying in an official proceeding.  In contrast to (c)(2), this provision—which carries a significantly lower maximum penalty—does not require a defendant to act "corruptly."

This is not to deny that (c)(2)—if allowed its broad, ordinary meaning—overlaps with several offenses in Chapter 73. See *ante*, at 492–493.  Even so, (c)(2) still leaves a healthy

BARRETT, J., dissenting

amount of work for other obstruction offenses. And besides, "substantial" overlap "is not uncommon in criminal statutes." *Loughrin* v. *United States*, 573 U. S. 351, 358, n. 4 (2014); see also *Hubbard* v. *United States*, 514 U. S. 695, 714, n. 14 (1995) (opinion of Stevens, J.). "The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino* v. *United States*, 544 U. S. 349, 358, n. 4 (2005). That is especially true here, because Congress enacted (c)(2) *after* it had already enacted other subsections of § 1512, as well as obstruction offenses like §§ 1503 and 1505. The redundancy argument would have more force if (c)(2) "render[ed] superfluous an entire provision passed in proximity as part of the *same Act*." *Yates* v. *United States*, 574 U. S. 528, 543 (2015) (plurality opinion) (emphasis added). As it stands, the canon against surplusage does not provide any reason to artificially narrow (c)(2)'s scope.

In any event, the Court's formulation does not begin to cure the statutory overlap. Killing a person with the intent to prevent the production of a record in an official proceeding constitutes conduct that impairs the availability of a record for an official proceeding. 18 U. S. C. § 1512(a)(1)(B). Using physical force against a person to influence testimony in an official proceeding counts as impairing the integrity of "other things" used in an official proceeding. § 1512(a)(2)(A). And impairing the availability or integrity of documents for use in an official proceeding will often "influenc[e], obstruc[t], or imped[e] . . . the due administration of justice." § 1503(a); see also § 1515(a)(1)(A) ("'official proceeding'" includes "a proceeding before a judge or court of the United States"). Examples abound. See, *e. g.*, §§ 1505, 1512(a)(1)(A), (a)(2)(B), (b)(1), (b)(2), (d)(1). "[T]he canon against surplusage merely favors that interpretation which *avoids* surplusage"—and on that score, the Court's interpretation fares no better than mine. *Freeman* v. *Quicken Loans, Inc.*, 566 U. S. 624, 635 (2012).

In fact, the broader statutory context works *against* the Court's interpretation. Congress did not select the verbs "obstruct," "influence," and "impede" at random. Those words were already in §1503, which prohibits "corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice." We have described this "'Omnibus Clause'" as a "catchall," because it follows several specific proscriptions against coercive behavior toward jurors and court officers. *Aguilar*, 515 U. S., at 598. Courts have routinely declined to "rea[d] the omnibus clause" as limited to "acts similar in manner to those prescribed by the statute's specific language." *United States* v. *Howard*, 569 F. 2d 1331, 1333, 1335 (CA5 1978) (collecting cases). And Justice Scalia agreed that *ejusdem generis* did not apply to limit the Omnibus Clause, "one of the several distinct and independent prohibitions contained in §1503 that share only the word 'Whoever,' which begins the statute, and the penalty provision which ends it." *Aguilar*, 515 U. S., at 615 (opinion concurring in part and dissenting in part). Section 1512(c) follows the very same pattern.

## C

The Court concludes with an appeal to consequences: Construing (c)(2) broadly would "expos[e] activists and lobbyists alike to decades in prison." *Ante*, at 496. This fear is overstated.

To begin with, the Court ignores that (c)(2) requires proof that a defendant acted "corruptly." The meaning of this term is unsettled, but all of its possible definitions limit the scope of liability. On one proposed interpretation, a defendant acts corruptly by "'us[ing] unlawful means, or act[ing] with an unlawful purpose, or both.'" *United States* v. *Robertson*, 103 F. 4th 1, 8 (CADC 2023) (approving jury instructions for (c)(2)). On another, a defendant acts "corruptly" if he "act[s] 'with an intent to procure an unlawful benefit

either for himself or for some other person.'" 64 F. 4th, at
352 (Walker, J., concurring in part and concurring in judg-
ment) (quoting *Marinello*, 584 U. S., at 21 (THOMAS, J.,
dissenting); alterations omitted). Under either, the "cor-
ruptly" element should screen out innocent activists and lob-
byists who engage in lawful activity. And if not, those de-
fendants can bring as-applied First Amendment challenges.

The Court also emphasizes (c)(2)'s 20-year maximum pen-
alty. *Ante*, at 496–497. But it simultaneously "glosses over
the absence of any prescribed minimum." *Yates*, 574 U. S.,
at 569 (KAGAN, J., dissenting). "Congress presumably
enacts laws with high maximums and no minimums when it
thinks the prohibited conduct may run the gamut from major
to minor." *Ibid.* Indeed, given the breadth of its terms,
(c)(2) naturally encompasses actions that range in severity.
Congress presumably trusted District Courts to impose sen-
tences commensurate with the defendant's particular
conduct.

\* \* \*

There is no getting around it: Section 1512(c)(2) is an ex-
pansive statute. Yet Congress, not this Court, weighs the
"pros and cons of whether a statute should sweep broadly or
narrowly." *United States* v. *Rodgers*, 466 U. S. 475, 484
(1984). Once Congress has set the outer bounds of liability,
the Executive Branch has the discretion to select particular
cases to prosecute within those boundaries. By atextually
narrowing § 1512(c)(2), the Court has failed to respect the
prerogatives of the political branches. Cf. *ante*, at 497. I
respectfully dissent.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication
and citation style of the United States Reports. The revised pagination
makes available the official United States Reports citation in advance of
publication. The syllabus has been prepared by the Reporter of Decisions
for the convenience of the reader and constitutes no part of the opinion of
the Court. A list of counsel who argued or filed briefs in this case, and
who were members of the bar of this Court at the time this case was
argued, has been inserted following the syllabus. Other revisions may
include adjustments to formatting, captions, citation form, and any errant
punctuation. The following additional edits were made:

None