# In the Iowa Supreme Court

No. 23–0670

Submitted December 17, 2024—Filed January 24, 2025

**MIMG CLXXII Retreat on 6th, LLC,**

Appellant,

vs.

**Mackenzie Miller** and **Parties in Possession,**

Appellees.

Appeal from the Iowa District Court for Linn County, Lars G. Anderson, judge.

A landlord appeals a district court decision affirming a small claims court's decision to dismiss the landlord's forcible entry and detainer action for failure to give the tenant thirty days' notice to vacate under the Federal CARES Act. **Reversed and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Mark E. Weinhardt (argued) of The Weinhardt Law Firm, Des Moines, for appellant.

Patrick Bigsby (argued), Melanie N. Huettman, and Alexander V. Kornya of Iowa Legal Aid, Des Moines, for amicus curiae Iowa Legal Aid.

Jodie C. McDougal and Jackson G. O'Brien of Fredrikson & Byron, P.A., Des Moines, for amici curiae Greater Iowa Apartment Association; Iowa Manufactured Housing, Association; Landlords of Iowa, Inc.; Central Iowa Property Association; Dubuque Area Landlords Association, Inc.; Fort Dodge

Area Landlord's Association; Iowa City Apartment Association, Inc.; Landlords of Linn County; Marshalltown Rental Property Association; Muscatine Landlord Association, Inc.; North Iowa Landlords Association; Pottawattamie County Landlord Association; Siouxland Rental Association, Inc.; Southeast Iowa Property Owners; Wapello County Area Chapter Landlords Association; and Conlin Properties, Inc.

**Mansfield, Justice.**

### I. Introduction.

This case asks us to decide whether Congress enacted a nationwide *permanent* thirty-day pre-eviction notice requirement for many of our nation's rental units as a part of *temporary* COVID-19-related legislation. The legislation applies to all "covered dwelling[s]." 15 U.S.C. § 9058(c)(1). This is a large category, which includes the substantial share of our nation's rental housing that is privately owned and serves tenants of varied income levels but that also happens to have federally backed mortgage financing.

Read in isolation, 15 U.S.C. § 9058(c)(1) states that "[t]he lessor of a covered dwelling unit . . . may not require the tenant to vacate the covered dwelling unit before the date that is 30 days after the date on which the lessor provides the tenant with a notice to vacate." There is no expiration date. But no statutory provision is an island, and we conclude that section 9058(c)(1) must be read together with the time limits in the provisions that precede and follow it. This is especially true because section 9058(c)(1) intrudes on a traditional area of state and local control, namely, landlord–tenant law. Also, the insular reading of section 9058(c)(1) would lead unavoidably to the conclusion that a landlord has to give a thirty-day pre-eviction notice even for tenants engaged in criminal activity or other actions that threaten the safety of other tenants. Just as section 9058(c)(1), read alone, has no temporal limits, it also has no limits based on the grounds for eviction. In addition, as we explain herein, an insular reading of section 9058(c)(1) results in a bizarre legal regime under which landlords could have *evicted* tenants from covered dwellings during the moratorium on certain grounds but could not have *served pre-eviction notices* on them.

Accordingly, we conclude that section 9058(c)(1) must be read in conjunction with neighboring provisions. So read, it applies only to tenants who defaulted as to rent during the 120-day COVID-19-related moratorium on evictions. As we also discuss herein, this holistic interpretation is well-supported by relevant United States Supreme Court precedent. We therefore reverse the judgment below and remand for further proceedings consistent with this opinion.

## II. Facts and Procedural History.

**A. The Lease.** MIMG CLXXII Retreat on 6th, LLC (The Retreat) owns an apartment building in Cedar Rapids. On June 25, 2022, Mackenzie Miller entered a one-year residential lease for an apartment in The Retreat. Rent was due on the first day of the month, with late charges accruing starting on the fifth day. The lease also provided that if the tenant failed to pay rent when due, the landlord would issue a three-day notice to pay rent. If rent was not paid within that three-day period, the landlord would terminate the tenancy and could pursue all remedies, including the filing of a forcible entry and detainer (FED) action.

This three-day notice period in the lease aligns with Iowa law. Iowa law allows a landlord to terminate a tenancy "[i]f rent is unpaid when due and the tenant fails to pay rent within three days after written notice by the landlord of nonpayment and the landlord's intention to terminate the rental agreement if the rent is not paid within that period of time." Iowa Code § 562A.27(2) (2022). Further, Iowa law allows an FED action to be commenced once the three-day notice has been given and the tenancy has been terminated. *Id.* § 648.3(2).

**B. The FED Action in Small Claims Court.** On December 7, The Retreat served Miller with a notice stating that she had not paid her monthly rent and that the lease would be terminated if rent was not paid within three days. Nine

days after that, with the rent still unpaid, The Retreat filed an FED action in the small claims division of the Linn County District Court.

On January 9, 2023, the small claims court heard The Retreat's FED action. Miller did not appear. The court, however, declined to enter an eviction order. Instead, the court dismissed the action after ruling that the Federal CARES Act required The Retreat to provide a *thirty-day* notice prior to bringing an FED action.

**C. The CARES Act.** The Coronavirus Aid, Relief, and Economic Security Act, or "CARES Act," which Congress passed at the outset of the COVID-19 pandemic, includes a section entitled, "Temporary moratorium on eviction filings." 15 U.S.C. § 9058. It provides in part,

> (b) Moratorium
>
> During the 120-day period beginning on March 27, 2020, the lessor of a covered dwelling may not—
>
> (1) make, or cause to be made, any filing with the court of jurisdiction to initiate a legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges; or
>
> (2) charge fees, penalties, or other charges to the tenant related to such nonpayment of rent.
>
> (c) Notice
>
> The lessor of a covered dwelling unit—
>
> (1) may not require the tenant to vacate the covered dwelling unit before the date that is 30 days after the date on which the lessor provides the tenant with a notice to vacate; and
>
> (2) may not issue a notice to vacate under paragraph (1) until after the expiration of the period described in subsection (b).

*Id.* § 9058(b)–(c).

The Retreat's apartment building is a "covered dwelling" under 15 U.S.C. § 9058(a)(5)(B) because it has mortgage financing purchased or securitized by

the Federal National Mortgage Association. The small claims court concluded that section 9058(c)(1) preempted Iowa law and required a thirty-day notice.

**D. Appeal to the District Court.** The Retreat appealed to the district court. It argued that section 9058(c)(1) was time-limited; that is, it did not apply to a tenancy that was entered into and terminated long after the 120-day moratorium in section 9058(b) had ended.

The district court rejected this argument. It held that "the plain language of 15 U.S.C. § 9058 unambiguously provides that the 30-day notice requirement challenged by Plaintiff is not expired." The court contrasted section 9058 with the previous section of the CARES Act, section 9057. Section 9057 is entitled, "Forbearance of residential mortgage loan payments for multifamily properties with Federally backed loans," and contains a time limit expressly applicable to the entire section. *Id.* § 9057(a), (f)(5). Section 9058, on the other hand, sets forth a time limit in subsection (b) but not (c).

The Retreat filed an application for discretionary review. We granted the application and retained the case. Iowa Legal Aid has appeared as an amicus curiae to argue in support of the judgment below.

**III. Standard of Review.**

"A motion to dismiss ruling is reviewed for correction of errors at law." *Riley Drive Ent. I, Inc. v. Reynolds*, 970 N.W.2d 289, 295 (Iowa 2022). When we review motions to dismiss, "we accept as true the petition's well-pleaded factual allegations, but not its legal conclusions." *Id.* (quoting *Shumate v. Drake Univ.*, 846 N.W.2d 503, 507 (Iowa 2014)).

Issues of statutory interpretation are reviewed for correction of errors at law. *Vaudt v. Wells Fargo Bank, N.A.*, 4 N.W.3d 45, 48 (Iowa 2024).

**IV. Legal Analysis.**

**A. The Arguments on Appeal.** On appeal, The Retreat advances three arguments for reversal of the courts below and entry of judgment in its favor. First, The Retreat insists that section 9058(c)(1) does not preempt the three-day notice provisions in Iowa Code sections 562A.27(2) and 648.3(2). Second, it argues that section 9058(c)(1), when read in full context, applies only to rent-related defaults that arose during the 120-day moratorium in section 9058(b). Finally, The Retreat maintains that the small claims court erred in ruling sua sponte in favor of a tenant who did not appear.

In reality, all three arguments boil down to one. The first argument hinges on the second because whether state law is preempted depends upon whether section 9058(c)(1) applies to postmoratorium defaults. In other words, statutory interpretation controls preemption. As for The Retreat's third point, The Retreat concedes that our consideration of its arguments will remedy any surprise that may have occurred in the small claims court.

The district court examined 15 U.S.C. § 9058(c). It observed that "the plain language" of section 9058(c) contains no expiration date. The court noted that both section 9057 and section 9058(b) have such dates. It reasoned that a court should not write a date into the law that Congress didn't enact.

The Retreat counters that the statute has to be read as a whole, and as a whole it is ambiguous. The title of 15 U.S.C. § 9058, as enacted by Congress, is "Temporary moratorium on eviction filings." This is followed by three subsections—(a), (b), and (c). Subsection (a) consists of definitions. Subsections (b) and (c) are the operative provisions. Subsection (b) establishes the 120-day moratorium through July 24, 2020, on filing eviction cases for nonpayment or on imposing late fees. Subsection (c) states that the landlord may not require

"the tenant" to vacate the covered dwelling unit until thirty days after a notice to vacate has been served and may not issue a notice to vacate until after the expiration of the 120-day moratorium. *Id.* § 9058(c). The Retreat urges that "the tenant" refers back to a tenant referenced in section 9058(b), and therefore the thirty-day notice provision only applies to tenants whose defaults arose during the 120-day moratorium. Additionally, The Retreat argues that there is a presumption against preemption of state landlord–tenant law. And, it argues that the district court's interpretation leads to absurd results. For example, it could tie a landlord's hands for thirty days in evicting a tenant who is operating a meth lab in their apartment. And it leads to additional tension with state law because Iowa Code section 648.18 provides that "[t]hirty days' peaceable possession with the knowledge of the plaintiff after the cause of action accrues is a bar to [an FED] proceeding."

**B. Section 9058(c)(1) Decisions from Other Courts.** Judicial decisions to date have supported the district court's "plain language" reasoning. For example, in *Arvada Village Gardens LP v. Garate*, the Colorado Supreme Court explained as follows:

> By its terms, the Moratorium Provision expired on July 24, 2020, after the "120-day period beginning on March 27, 2020." 15 U.S.C. § 9058(b). But the Notice Provision includes no expiration date. We cannot insert an expiration date where Congress omitted one. Rather, we must presume that Congress meant what it said— although the Moratorium Provision expired, the Notice Provision did not.

529 P.3d 105, 108 (Colo. 2023) (en banc) (citations omitted). The court added,

> The statute's title, "Temporary moratorium on eviction filings," doesn't change anything. By its own terms, the Moratorium Provision *was* temporary. But just because the word "temporary" is in the title doesn't mean that the Notice Provision must receive the same treatment. To the contrary, a title cannot limit the plain

meaning of a more specific provision within a statute. . . . Section 9058 contains no such ambiguity.

*Id.* (citations omitted).

The Ohio Court of Appeals engaged in a similar analysis, stating that "[a]ccording to the plain language of the statute, the moratorium provision expired, but the notice provision did not." *Olentangy Commons Owner LLC v. Fawley*, 228 N.E.3d 621, 633 (Ohio Ct. App. 2023). The Ohio court observed that "the text of 15 U.S.C. 9058(c)(1) contains no ambiguity, so we need not resort to the statute's title for assistance in interpreting it." *Id.* at 634.

Other courts have treated the matter in a more cursory fashion but have come to the same outcome. *See, e.g., D.H. v. Common Wealth Apartments*, 231 N.E.3d 284, 288 (Ind. Ct. App. 2024).[1]

Recently, a Virginia appellate court did not challenge this reading, yet it found a way to mitigate its effects. In *Woodrock River Walk LLC v. Rice*, 906 S.E.2d 682, 686–87 (Va. Ct. App. 2024), the Virginia Court of Appeals held that the statute does not prohibit a landlord from filing an FED action in state court while the thirty days are still running so long as the tenant is not displaced from the premises during that time. The court explained,

> Neither a summons nor a notice of termination of a lease requires a tenant to vacate the premises. A landlord has a legal right to remove a tenant from their premises only when an officer executes a writ of eviction, after a landlord complies with multiple procedural stages in the eviction process. Therefore, the CARES Act is violated only when an officer executes a writ during the 30 days after a landlord has served a notice to vacate.

*Id.* at 687.

---

[1]Notably, a concurring opinion agreed that the notice provision of section 9058(c)(1) remained in force after July 24, 2020, but concluded that it applied only to rent defaults that occurred before April 10, 2023—the end of the national COVID-19 emergency. *D.H.*, 231 N.E.3d at 289–90 (Bailey, J., concurring).

Other courts have rejected this approach. They have reasoned that section 9058(c)(1) requires thirty days' notice before *the lessor* can require the tenant to vacate, not thirty days to elapse before *a court or a sheriff* can. *See Oletangy*, 228 N.E.3d at 633 ("According to 15 U.S.C. 9058(c)(1), the actor prohibited from requiring the tenant to vacate is '[t]he lessor,' not the court or law enforcement officers." (alteration in original)); *Sherwood Auburn LLC v. Pinzon*, 521 P.3d 212, 218 (Wash. Ct. App. 2022) ("This assertion reflects a misunderstanding of unlawful detainer law. Indeed, service of the pay or vacate notice *is* the landlord requiring the tenant to quit the premises."). Under Iowa law, a landlord requires a tenant to vacate by giving a notice of termination or a notice to quit. *See* Iowa Code § 648.3(1) (treating a three-day notice to pay rent plus lease termination as equivalent to a notice to quit). An FED action is the mechanism for getting *a court* to order the tenant's removal. *See id.* § 648.22.

In sum, other jurisdictions have so far been in unison that section 9058(c)(1) remains in effect today. But the unanimity on this point has been accompanied by some divergence on another aspect of section 9058(c)(1), specifically whether the thirty-day notice requirement applies to defaults *other than* nonpayment. A division of the Washington Court of Appeals recently held that section 9058(c) only applies to "evictions stemming from nonpayment of rent." *Hous. Auth. v. Knight*, 543 P.3d 891, 896 (Wash. Ct. App. 2024), *review granted*, No. 102905–5 (Wash. July 10, 2024). The court reasoned that the three subsections of section 9058 were "intertwined." *Id.* at 895. In other words: "Congress, by implication, intended that the nonpayment of rent basis provided in subsection (b) apply to both paragraph (c)(1) and paragraph (c)(2)." *Id.* at 896. An alternative reading would lead to "absurd and unlikely circumstances." *Id.* at 898–99. "It is difficult to imagine Congress requiring a landlord—or neighboring

tenants—to wait 30 days for the eviction of a tenant engaging in criminal activity or nuisance on the premises." *Id.* at 898.

About six weeks before that ruling, another division of the Washington Court of Appeals reached a diametrically opposite conclusion. *See Pendleton Place, LLC v. Asentista*, 541 P.3d 397, 401–02 (Wash. Ct. App. 2024). There, the court emphasized that "[t]here is no language in 15 U.S.C. § 9058(c)(1) limiting its applicability to eviction related to nonpayment of rent. The eviction moratorium in 15 U.S.C. § 9058(b) contains such a limitation. 15 U.S.C. § 9058(c)(1) does not." *Id.* at 401. In that court's view, the "plain language" of the statute forbids such a limiting construction. *Id.*

To date, it appears most jurisdictions agree with the *Housing Authority v. Knight* court. *See Watson v. Vici Cmty. Dev. Corp.*, No. CIV–20–1011–F, 2022 WL 910155, at *10 (W.D. Okla. Mar. 28, 2022) (denying summary judgment because there was a genuine issue of fact whether the landlord was seeking eviction due to nonpayment of rent or for another reason); *Vandersluis v. Hilton*, No. WWM–CV22–6024867–S, 2023 WL 4738059, at *4 (Conn. Super. Ct. July 18, 2023) (finding that compliance with the thirty-day notice requirement is required only when the ground for eviction is nonpayment of rent); *Skowyra v. Stokes*, 383 So. 3d 160, 163 (La. Ct. App. 2023) ("The applicability of the CARES Act to evictions for reasons other than non-payment of rent is an issue more properly addressed in a motion for summary judgment.").

**C. Reading Section 9058 as an Integrated Whole.** But this raises an important point. Either section 9058 is "intertwined" or it isn't. If courts are importing subsection (b)'s nonpayment of rent limitation into subsection (c)(1)'s thirty-day notice requirement, shouldn't they also import subsection (b)'s moratorium period qualification into subsection (c)(1)? We believe section

9058(c)(1), read in context, applies only to nonpayment defaults that occurred during the 120-day moratorium described in section 9058(b).

A careful reading of section 9058 as a whole demonstrates this. In fact, if we were to say that section 9058(c)(1) performs a solo, rather than an ensemble role, the statute *just wouldn't work*. Read alone, section 9058(c)(1) covers all types of tenant defaults at all times. Iowa Legal Aid's attorney conceded at oral argument that it's inconsistent to read section 9058(c)(1) as limited to rental defaults but unlimited as to time. Section 9058(c)(2) then ties to section 9058(c)(1). It prohibits the landlord from issuing any eviction notice for a covered property until after the expiration of the 120-day COVID-19 moratorium described in section 9058(b). Thus, under the solitary reading, no notice to evict for a covered property for any reason could go out during the COVID-19 moratorium.

Next, we examine section 9058(b). For the duration of the COVID-19 moratorium, it bars the landlord of a covered property from filing a suit to recover possession, but only for nonpayment of rent. 15 U.S.C. § 9058(b)(1). During that time, it also bars the landlord from charging fees or penalties relating to nonpayment of rent. *Id.* § 9058(b)(2). So, the total effect of the solo reading works out as follows: during the COVID-19 moratorium, the landlord of a covered property could have filed an FED action against a tenant for a nonrent-related reason, *see id.* § 9058(b)(1) (restriction limited to rental defaults), but they could not have given the eviction notice that is a prerequisite to filing, *see id.* § 9058(c) (restriction not limited to rental defaults). That makes no sense at all.

Again, you either read section 9058 holistically or you don't. If subsection (c)(1) is to be detached from the remaining provisions of section 9058 and read in isolation, then it applies to *any* ground for eviction at *any* time. This means

thirty days' notice is required even if the tenant is engaged in criminal activity or creating a safety hazard on the premises. That seems to us an absurd result, as it did to the court that decided *Knight*. *See* 543 P.3d at 898–99. And even more odd and unworkable is the notion that, during the moratorium, the landlord could file an eviction action in such an emergency but couldn't serve the notice needed as a prerequisite to the eviction action. *Cf. Mellouli v. Lynch*, 575 U.S. 798, 809 (2015) ("Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (explaining that construction of a statutory term "must, to the extent possible, ensure that the statutory scheme is coherent and consistent").

Two additional points should be noted. First, the statute refers to "the lessor" and "the tenant" in subsection (c)(1) after referring to "the lessor" and "the tenant" in subsection (b). 15 U.S.C. § 9058(b)–(c). This suggests to us that it's the same lessor and the same tenant who are already affected by the moratorium in subsection (b). If subsection (c)(1) were to have perpetual life and apply to defaults long after the COVID-19 pandemic had passed, logically Congress would have said "a landlord" and "a tenant."

Second, subsection (c)(2) by its terms relates to the moratorium, i.e., "until after the expiration of the period described in subsection (b)." *Id.* § 9058(c)(2). It is also tethered to subsection (c)(1) by the heading "Notice" and the word "and" indicating that the two subsections are related. *Id.* § 9058(c)(1). Logically, the relationship is that the default must have arisen during the period of the moratorium. It would be incongruous to have a provision that is unrelated to the moratorium (hypothetically subsection (c)(1)) sandwiched inside three provisions clearly related to the moratorium. *See* Antonin Scalia & Bryan A. Garner,

*Reading Law: The Interpretation of Legal Texts* 197 (2012) [hereinafter Scalia & Garner, *Reading Law*] ("Although most associated-words cases involve listings— usually a parallel series of nouns and noun phrases, or verbs and verb phrases— a listing is not a prerequisite. An 'association' is all that is required.").

Of course, "when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Gallardo ex rel. Vassallo v. Marstiller,* 596 U.S. 420, 431 (2022) ("[W]e must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others."); *Badgerow v. Walters,* 596 U.S. 1, 11 (2022) (" '[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we generally take the choice to be deliberate." (alteration in original) (quoting *Collins v. Yellen,* 594 U.S. 220, 248 (2021))). And it's true that unlike subsection (b), subsection (c)(1) is not expressly limited to actions taken by the landlord "during" the 120-day moratorium period. But that omission actually makes sense when you think about it.

The omission does not mean that subsection (c)(1) is *unrelated* to the moratorium period. Rather, in our view it means that subsection (c)(1) is limited to defaults *arising during the moratorium period*. Such a time limit bears a logical relationship to subsection (b), but it's a different time limit. Therefore, subsection (c)(1) couldn't simply repeat or directly incorporate the precise language from subsection (b). In other words, subsection (c)(1) didn't use the subsection (b) time qualification because that would not have been the appropriate time qualification to use.

**D. Supreme Court Precedent Borrowing from Adjacent Provisions to Qualify a Seemingly Unqualified Provision.** "Context is a primary determinant of meaning. A legal instrument typically contains many interrelated parts that make up the whole." Scalia & Garner, *Reading Law* at 167. "[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.' " *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").

Applying this principle, the Supreme Court has frequently found that a facially unqualified provision of law is subject to the same qualifications as nearby, related provisions. For example, the Supreme Court decided long ago that section 3 of the Federal Arbitration Act, which on its face applies to "any issue referable to arbitration under an agreement in writing for such arbitration," incorporates the subject-matter limit of the previous sections, which limit coverage to arbitration provisions "in any maritime transaction or a contract evidencing a transaction involving commerce." *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 200–01, 200 nn.1–2 (1956) (quoting 9 U.S.C. §§ 2–3). As the Court put it, "Since § 3 is part of the regulatory scheme, we can only assume that the 'agreement in writing' for arbitration referred to in § 3 is the kind of agreement which §§ 1 and 2 have brought under federal regulation." *Id.* at 201; *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 110 (2019) ("[A]ntecedent statutory provisions limit the scope of the court's powers under §§ 3 and 4.").

Even earlier, in *United States v. Goldman*, 277 U.S. 229, 238 (1928), the Supreme Court held that a statute of limitations for contempt that was "broad

enough, upon its face, to provide a period of limitation of one year in all criminal contempts," extended only to the types of contempt covered by the preceding sections. Although the statute said literally that "no proceeding for contempt shall be instituted against any person unless begun within one year from the date of the act complained of," the Court determined that "when construed in the light of the context and read in connection with the preceding sections, it does not relate to the prosecution for criminal contempts of the character here involved." *Id.* (quoting Clayton Act, ch. 323, 38 Stat. 730 (1914) (codified as amended at 18 U.S.C. § 3285)).

In *Fischer v. United States*, 603 U.S. 480, 484 (2024), the Supreme Court recently followed a similar approach in interpreting a federal criminal law with two adjacent subsections. The defendant had been a participant in the January 6, 2021, events at the United States Capitol. *Id.* He was alleged to have invaded the Capitol and to have become involved in a physical confrontation with law enforcement. *Id.* The defendant sought the dismissal of a federal obstruction charge brought under 18 U.S.C. § 1512(c)(2). *Fischer*, 603 U.S. at 484–85. In the defendant's view, the provision "criminalize[d] only attempts to impair the availability or integrity of evidence." *Id.* Section 1512(c) reads as follows:

> (c) Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

Read in isolation, section 1512(c)(2) seemingly applied to any attempt to obstruct an official proceeding, such as the joint session being held on January 6 to certify the presidential vote. But the Court agreed with the defendant that section 1512(c)(1) and section 1512(c)(2) had to be read as intertwined because of the word "otherwise." *Fischer*, 603 U.S. at 491–92.

The Court elaborated,

> To see why, consider a straightforward example. A zoo might post a sign that reads, "do not pet, feed, yell or throw objects at the animals, or otherwise disturb them." If a visitor eats lunch in front of a hungry gorilla, or talks to a friend near its enclosure, has he obeyed the regulation? Surely yes. Although the smell of human food or the sound of voices might well disturb gorillas, the specific examples of impermissible conduct all involve direct interaction with and harassment of the zoo animals. Merely eating or talking is so unlike the examples that the zoo provided that it would be implausible to assume those activities were prohibited, even if literally covered by the language.

*Id.* at 487–88.

Consider a similar example closer to the facts of this case. Suppose a sign at the front of the zoo read,

> 1. During the time period 2–4 p.m. on July 4, 2025, the zoo will be closed for a private party.

> 2. The public is requested not to park on the streets outside the zoo.

> 3. The public will be admitted to the zoo starting again on 4:00 p.m. on July 4.

Although item 2 is not time-limited per se, one would logically conclude that its prohibition against parking on the streets outside the zoo applied only to the period when the zoo is closed to the general public due to the private party.

The foregoing decisions are merely ore samples from a larger lode. On several occasions, the Supreme Court has read a seemingly unbounded legal provision as narrowed by the limits contained in provisions next door. *See*

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 276 (2023) ("We thus decline to read § 1604's grant of immunity to apply in criminal proceedings—a category of cases beyond the civil actions contemplated in § 1330(a), the jurisdictional grant to which § 1604 is substantively and sequentially linked."); *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60–63 (2004) (interpreting a provision of the Truth in Lending Act that, unlike its neighbors, did not have express minimum and maximum damage limits as containing such limits while noting that "[s]tatutory construction is a 'holistic endeavor' " and that the alternative reading would lead to results that are "passing strange" (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))); *Gutierrez v. Ada*, 528 U.S. 250, 254–55 (2000) ("The reference to 'any election' is preceded by two references to gubernatorial election and followed by four. With 'any election' so surrounded, what could it refer to except an election for Governor and Lieutenant Governor [of Guam], the subject of such relentless repetition?").

Conversely, in *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 442 (2002), the Supreme Court held that a subsection that appeared to apply to states actually applied also to political subdivisions of states. The case involved four consecutive savings provisions in a statute with otherwise preemptive effect. *Id.* at 434. The first and fourth subsections explicitly covered both states and political subdivisions. *Id.* at 429–30. The second only mentioned states. *Id.* The third didn't contain a limit at all. *Id.* The Court determined that the second and third subsections should be read in concert with the first and fourth to apply to both states and political subdivisions. *Id.* at 436. Among other things, treating each subsection as a solo performer would "introduce[] an interpretive conundrum of another kind." *Id.*

We follow the same approach here in concluding that section 9058(c)(1) applies only to rent defaults that arose during the 120-day moratorium and isn't a permanent rewrite of certain state landlord–tenant laws jammed into otherwise temporary legislation.

**E. The Presumption Against Preemption Also Supports an Interpretation of Section 9058(c)(1) as Related to the Moratorium Period.** On top of what we have already said, there is a presumption against preemption, especially in areas traditionally entrusted to state and local law. We start with the general presumption against federal preemption. *See Bond v. United States*, 572 U.S. 844, 857–58 (2014) ("It has long been settled, for example, that we presume federal statutes do not . . . preempt state law." (citations omitted)); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 116–17 (1992) (Souter, J., dissenting) ("If the [federal] statute's terms can be read sensibly not to have a pre-emptive effect, the presumption controls and no pre-emption may be inferred."); Scalia & Garner, *Reading Law* at 290–94.

That presumption is heightened when federal law would intrude on an area of traditional state responsibility. *See Ours Garage*, 536 U.S. at 438 (noting "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996))); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (discussing "the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress'" (alterations and omission in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))). It also applies when there is clearly *some* preemption, but there is room for debate as to *how far* Congress has

preempted state law. *See, e.g., Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

Recently, in *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 594 U.S. 758, 763–66 (2021) (per curiam), the Supreme Court struck down an administrative moratorium on evictions imposed by the Centers for Disease Control during the height of the COVID-19 pandemic, reasoning that this moratorium lacked proper legislative authorization. The Court pointed out that "[t]he moratorium intrudes into an area that is the particular domain of state law: the landlord–tenant relationship." *Id.* at 764. The Court added, "Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020)).

It is one thing to say that Congress preempted local landlord–tenant law briefly during the national COVID-19 emergency. It would be another to say that Congress preempted it permanently.

In another "MIMG" case involving 15 U.S.C. § 9058(c)(1) that the Nebraska Supreme Court dismissed as moot, a concurring opinion noted this presumption, which it characterized as "the federalism canon." *See MIMG LXXIV Colonial, LLC v. Ellis*, 6 N.W.3d 799, 806 (Neb. 2024) (per curiam) (Papik, J., concurring). The concurrence pointed out that "a permanent federal 30-day notice requirement for residential evictions . . . significantly alters the balance of state and federal power" and that "the notice requirements for evictions for" properties receiving some form of federal financial assistance "have traditionally been determined by state law." *Id.* The concurrence noted that prior decisions holding that subsection (c)(1) enacted a permanent thirty-day notice requirement

had not taken account of the federalism canon. *Id.* at 805. It concluded, "[I]f a court could identify a tenable reading of the statutory text that did not significantly alter the traditional balance between state and federal power in the same way, the federalism canon would seem to require that interpretation be adopted." *Id.* at 807.[2]

We believe such a reading is tenable and, indeed, is the better reading of the text when considered in its full context.

**V. Conclusion.**

As we have said, "Statutory interpretation is not like proving math theorems, and it is sometimes difficult to come up with a neat answer that is intellectually satisfying." *Gluba v. State Objection Panel*, 11 N.W.3d 459, 466 (Iowa 2024) (per curiam) (quoting *Schmett v. State Objections Panel*, 973 N.W.2d 300, 304 (Iowa 2022) (per curiam)). In the end, we believe that the most correct interpretation of 9058(c)(1) is that it applies only to rent defaults that arose during the moratorium—the subject of the rest of section 9058—and not to any default at any time for any reason. Congress federalized the law of evictions to some degree in March 2020, but it only did so temporarily.

For the foregoing reasons, we reverse the judgment below and remand for further proceedings consistent with this opinion.

**Reversed and Case Remanded.**

---

[2]Iowa Legal Aid argues that Congress enacted section 9058(c)(1) pursuant to its Spending Clause authority, and that Congress had constitutional authority to permanently override state landlord–tenant law with respect to the dwellings covered by the statute. We do not question these propositions. The question is whether the statute, fairly read, actually has that effect. In our view, this is not a case where the presumption against preemption is displaced by "voluntary agreements to relinquish authority . . . in exchange for federal funds." *Ours Garage*, 536 U.S. at 439. The federal funds came first, without the eviction restrictions, and then Congress (according to Iowa Legal Aid) made an unprecedented incursion into state landlord–tenant law. *See Hillman v. Maretta*, 569 U.S. 483, 490–91 (2013) (explaining that the presumption against preemption in the area of domestic relations applies even to legislation governing group life insurance for federal employees).